UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STEPHEN FRIEDRICH, Individually          :
and as Executor of the Estate of          :
PATRICIA FRIEDRICH and p.p.a. S.F.;       :
and AMY FRIEDRICH                         :
                                          :
v.                                        :          C.A. No. 1:14-cv-00353-L-PAS
                                          :
SOUTH COUNTY HOSPITAL                     :
HEALTHCARE SYSTEM;                        :
JOSEPH P. TURNER, D.O.;                   :
JOHN and/or JANE DOE, Alias; and          :
JOHN DOE CORPORATION, Alias               :

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR OBJECTION TO DEFENDANT SOUTH COUNTY HOSPITAL HEALTHCARE SYSTEM'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### INTRODUCTION

Plaintiffs hereby submit the within Memorandum of Law in support of their Objection to Defendant South County Hospital Healthcare System's Motion for Partial Summary Judgment. Based on the following, plaintiffs respectfully request that defendant's motion for partial summary judgment ("the Motion") be denied.

### FACTS

On Monday, September 9, 2013, Patricia Friedrich presented to the South County Hospital Urgent/Walk-In Care ("the Urgent Care"), located at the South County Hospital Medical and Wellness Center ("the Wellness Center") in East Greenwich, Rhode Island, complaining of "burning in chest and left arm intermittent since Saturday." The chest pain was described as "severe" and was diagramed as sternal, radiating to both shoulders, neck, and down her right arm.  She was seen by Joseph Turner, D.O.  After undergoing several tests, Mrs. Friedrich was given a "GI cocktail" in an attempt to treat what the doctor concluded to be gastroesophageal reflux disease ("GERD"). Just fifteen minutes later, before several of the test results had been received, and with a pain level still

1

reported as "2/10," Mrs. Friedrich was discharged to home with no follow-up ordered. The next day, on September 10, 2013, Mrs. Friedrich was found unresponsive at home. Emergency Medical Response was called and cardiopulmonary resuscitation began upon their arrival. She was transported to South County Hospital in asystole and death was pronounced. An autopsy confirmed the cause of death as atherosclerotic and hypertensive cardiovascular disease.

Plaintiffs filed this action against the moving defendant, alleging in part that the treatment and care rendered to Patricia Friedrich at the South County Hospital Urgent/Walk-In Care failed to meet the standard of care and did not meet the requirements of the Emergency Medical Treatment and Active Labor Act ("EMTALA"). Plaintiffs allege that the defendant violated EMTALA by failing to provide an appropriate medical screening and improperly discharging Mrs. Friedrich without stabilization.

Adopted by the United States Congress in 1986, the Emergency Medical Treatment and Active Labor Act requires that federally funded hospitals must provide an "appropriate medical screening examination" to individuals who present to a "hospital emergency department" requesting an examination, to determine whether or not an "emergency medical condition" exists. *See* 42 U.S.C. § 1395dd(a). "Emergency medical condition" is defined, in pertinent part, as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--
>> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>> (ii) serious impairment to bodily functions, or
>> (iii) serious dysfunction of any bodily organ or part.

*See* 42 U.S.C. § 1395dd(e)(1). Additionally, EMTALA requires that when it is determined that an individual has an emergency medical condition, the hospital must provide further medical examination and treatment as required to stabilize the emergency medical condition, within the staff

and facilities available at the hospital, or in the alternative, provide transfer of the individual to another medical facility. *See* 42 U.S.C. § 1395dd(b).

"To establish a violation of the screening or stabilization provisions in EMTALA, a plaintiff must prove that: (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition." *Alvarez-Torres v. Ryder Mem'l Hosp., Inc.,* 582 F.3d 47, 51 (1ˢᵗ Cir. 2009) citing *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1190 (1ˢᵗ Cir. 1995). "EMTALA requires that 'if an emergency medical condition exists, the participating hospital must render the services that are necessary to stabilize the patient's condition…unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety.'" *Ramos-Cruz v. Centro Medico del Turabo*, 642 F.3d 17, 18 (1ˢᵗ Cir. 2011), citing *Correa* at 1189.

Since its enactment, EMTALA has been expanded and clarified on several occasions. Most germane to the instant case, in 1994, regulations applied the screening and stabilization requirements to patients anywhere on hospital property. *See* 42 C.F.R. §§ 489.20 and 489.24. The Centers for Medicaid and Medicare Services ("CMS"), a division of the Department of Health and Human Services is responsible for the Medicare program and the development and enforcement of regulations on EMTALA. *See Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 174 (3d Cir.) *amended*, 586 F.3d 1011 (3ʳᵈ Cir. 2009) ("CMS has the congressional authority to promulgate rules and regulations interpreting and implementing Medicare-related statutes such as EMTALA."). In 2000, CMS codified its interpretation of EMTALA, expanding it to include inpatient areas, hospital buildings that are within 250 yards of the hospital's main campus, and off-campus facilities that are

considered part of the hospital for Medicare cost reimbursement purposes. *See* 67 Fed. Reg. 31,404, 31,476-478 (May 9, 2002). On September 9, 2003, CMS's "Final Rules" were promulgated in the *Federal Register*, which provided clarification of several issues including the term "comes to the emergency department," "dedicated emergency department," applications for non-dedicated emergency department presentation on a hospital's campus, and applicability to off-campus hospital departments. *See* 68 Fed. Reg. 53,222, 53,250 (Sept. 9, 2003), attached hereto as Exhibit 1. *See also Morales v. Sociedad Espanola de Auxilio Mutuo y Beneficencia*, 524 F.3d 54, 58 (1st Cir. 2008) (interpreting EMTALA statute and regulation).

## SUMMARY JUDGMENT STANDARD

The court may grant summary judgment only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When ruling on a motion for summary judgment, the court must construe the facts in the light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir.2003). Only "[w]hen a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact…and the moving party is entitled to judgment as a matter of law." *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 12 (1st Cir. 1994).

In determining the merits of a motion for summary judgment, the court is compelled to undertake two inquiries: (1) whether the factual disputes are genuine, and (2) whether any fact genuinely in dispute is material. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." *Id.* To determine if the dispute about a material fact is "genuine," the court

must decide whether "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1968).  It can meet its burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Celotex* at 4. The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.,* 18 F.3d 13, 15 (1st Cir.1994).

## ARGUMENT

By virtue of being a dedicated emergency department of a hospital that participates in Medicare, the South County Hospital Urgent/Walk-In Care is governed by and is subject to the provisions of EMTALA.  The responsibilities set forth in the EMTALA statute, regulations, and through agency guidance undoubtedly apply to the Defendant.  Defendant has presented several bold conclusions to suggest that the Urgent Care falls outside of the scope of EMTALA, with little to no evidence in support. Viewing the evidence in the light most favorable to the Plaintiffs, there is overwhelming support that the Urgent Care is obliged to meet the requirements set forth by EMTALA. At a minimum, there are genuine factual disputes concerning the circumstances of the Urgent Care's operations which are a material to the determination of Defendant's EMTALA liability.

## I. THE SOUTH COUNTY HOSPITAL URGENT/WALK-IN CARE IS PART OF SOUTH COUNTY HOSPITAL

Defendant has not disputed that EMTALA applies to South County Hospital ("the hospital"). *See* Defendant's Motion, pg. 6. However, Defendant has sought to distance the Urgent Care from the hospital, averring that there is no relationship between the two entities other than

"purely a business relationship" as both facilities are part of the same corporation, the South County Hospital Healthcare System ("the healthcare system"). *See* Defendant's Motion, pg. 8. The evidence does not support this gross misrepresentation.

From the outset, the Urgent Care holds itself out as part of the hospital to even a casual observer. It takes its name directly from the hospital—it is not the "South County Hospital *Health Care System* Urgent/Walk-In Care." This initial appearance is continually confirmed in documents, testimony, and other evidence that has been produced through the course of discovery.

**Licensure:**  South County Hospital is licensed as a hospital by the State of Rhode Island Department of Health, license number HOS00114.[1] *See* Department of Health License details, attached hereto as Exhibit 2. The license is issued to the hospital—not the healthcare system. The South County Hospital Medical and Wellness Center (consisting, in part, of the South County Hospital Urgent/Walk-In Care) is licensed in tandem with the hospital, possessing a "hospital premises" license, license number HOS00114-13.[2] *See id.* The Rhode Island Department of Health defines "premises" as "a tract of land and the buildings thereon where direct patient care services are provided." *See Rules and Regulations for Licensing of Hospitals (R-23-17-HOSP)*, as amended September 2012, Section 1.42.[3] General requirements for licensure state that "each premises and the related operations of a licensed hospital shall be approved by the Department of Health prior to the inclusion of that premises on the hospital license and commencement of operations at that location." *See id.*, Section 2.3. In fact, the defendant has produced a certificate that states "South County Hosp Med and Wellness Ctr [sic]…is an approved and licensed *component* of South County Hospital," attached hereto as Exhibit 3. (Emphasis supplied). As the Wellness Center is licensed by

---

[1] http://health.ri.gov/find/licensees/results.php?license=HOS00114
[2] http://health.ri.gov/find/licensees/results.php?license=HOS00114-13
[3] http://sos.ri.gov/documents/archives/regdocs/released/pdf/DOH/7022.pdf

virtue of South County Hospital's license to operate as a hospital, the relationship between the Urgent Care and the hospital is much greater than a mere business association under the same corporate parent.

**Defendant's Representations:** A Media Advisory from October 29, 2008 announced a "Ribbon Cutting and Dedication Ceremony at South County Hospital's new Medical & Wellness Center," attached hereto as Exhibit 4. This press release heralded the opening of South County Hospital's newest facility, the former North Kingstown Treatment Center, which is "being renamed to better reflect the broad range of services and its affiliation with South County Hospital." *Id.* As indicated, the connection between South County Hospital and the South County Hospital Urgent/Walk-In Care extends well beyond facilities. The medical staff and medical treatment rendered are inextricably intertwined between the hospital and the Urgent Care. A job description for the "medical director" of the South County Hospital Urgent/Walk-In Care reinforces that the "East Greenwich Urgent Care" is a *department* of the South County Hospital. *See* Medical Director Job Description, attached hereto as Exhibit 5. A letter to co-defendant Dr. Turner, the medical director in September 2013 who treated Mrs. Friedrich, welcomed him as the "new Medical Director for Urgent Care *at South County Hospital*." *See* Letter, attached hereto as Exhibit 6. (Emphasis supplied). Further job descriptions and performance appraisal forms demonstrate that the Urgent Care practice manager is a job through South County Hospital, not simply the healthcare system, and that the practice manager "ensures compliance with South County Hospital policies and procedures." *See* Practice Manager Job Description, attached hereto as Exhibit 7.

**Understanding by Urgent Care Staff:** The fact that the South County Hospital Urgent/Walk-In Care is part of South County Hospital was again confirmed by the deposition testimony of the nurse who served as practice manager at the Urgent Care during the relevant time period:

Q.    Are there any clinical standard organizations that you understood the Urgent Care to reference for compliance purposes or for standards?

A.    Well, we were members of the Urgent Care Association of America.

Q.    Did they have standards?

A.    They did have standards, but because we're a hospital, we go by our hospital standards and not a general urgent care standard.

*See* Deposition of Ann Marie Murphy, 107:15-23, attached hereto as Exhibit 8.

Dr. Turner and Ms. Murphy testified to the existence of a Policy and Procedure Manual ("manual") for the Wellness Center, which contained policies governing the Urgent Care. This manual, produced by defendant, included several South County Hospital policies and procedures, including "Chest Pain Protocol/Urgent Care," attached hereto as Exhibit 9. Defendant has also produced copies of other policies from South County Hospital that apply to the Urgent Care, including policies on EKG Interpretation and EKG Discrepancies, attached hereto as Exhibit 10. Uniformly, these are policies of South County Hospital, not the corporate healthcare system.

**Policies of the Urgent Care:**  Especially telling is the document entitled "Scope of Care-East Greenwich Urgent/Walk In Care Center" with the most recent revision date of 08/11, attached hereto as Exhibit 11. This document, bearing the heading "South County Hospital" and continually re-approved, describes the scope of care of "the East Greenwich Urgent Care/Walk In Center **of South County Hospital**." (Emphasis supplied.)  It states that "the Medical Director of the urgent/walk in care unit is credentialed as a member of the South County Hospital Medical Staff." Additionally, the physicians of the Urgent Care/Walk-In Center "participate in and are accountable to the policies and procedures of hospital medical staff to include peer review" and that "Nursing Staff members are employed by South County Hospital and are accountable to the Department of

Nursing." Furthermore, "the center operates under the same policies and procedures, with site specific references."[4]

Ms. Murphy further described the process of accessing policies of the hospital that applied to and were utilized by the Urgent Care in addition to those contained in the Policy and Procedure Manual:

> Q.   Okay.  Let me just take this in pieces.  You were aware as practice manager that the Urgent Care Center had to have policies that applied to the care being delivered, right?
>       MR. LATHAM:  Objection.
> A.   Yes.
>
> Q.   And you understood as practice manager that with respect to nursing policies, you had to have familiarity with those policies, correct?
> A.   Yes.
>
> Q.   And in order to have familiarity with those policies, you had to know what they were, right, which policies applied?
> A.   Yes.
>
> Q.   So what did you do when you were practice manager to figure out which policies applied to the Urgent Care that you were responsible – the compliance with which you were responsible for?
>       MR. LATHAM:  Objection.  You can answer.
>
> Q.   How did you figure out which policies applied?
> A.   Well, there are -- through the hospital, there are nursing policies and procedures which we would utilize through the intranet but not particularly Urgent Care, or we would try to, like I said earlier, change them to Urgent Care standards.
>
> Q.   Okay.  Under what circumstances would you go to the intranet to find a policy that you would then apply to the Urgent Care?  What would cause you to reach out to the intranet to get a policy and then apply it to the Urgent Care?
> A.   Because a lot of the policies, mostly the general ones, pertained to the hospital, pertained to the Urgent Care or hospital-wide.

---

[4] While Ms. Murphy testified at her deposition that she "can't say…for sure" that this scope of care was in effect in 2013, due to recalling "another one" being signed, the only possible differences she identified were a change in the Urgent Care hours of operation, that the medical director and manager no longer reported to the Vice President of Patient Care Services, and that "policies and procedures" might have changed under the medical group. *See* Murphy depo, Exhibit 8, 104:16 to 107:3. No later version of the Scope of Care has been identified or produced by Defendant.

Q.      Okay.  So when you --

A.      But I'm not sure.  Like I said, I'm not positive at what point.  When the medical group, it became them, they made a whole bunch of policies, and so that changed as well.

Q.      When you would go to the -- so I take it – and tell me if I'm putting this together wrong --that on occasion if you felt that you needed to consult a policy for the Urgent Care, you would go to the intranet and see if there was a hospital-wide policy that would cover the concern that you had; am I right so far?

A.      (Witness nodding.)

Q.      You need to answer.

A.      Sometimes, yes.

Q.      So when you identified a policy on the intranet that you felt appropriately applied to the Urgent Care, did you print that out or show it to anybody?

A.      Yes.

Q.      What did you do?

A.      I would print it out and I would show it.

Q.      And to whom would you show it?

A.      It could be staff.

Q.      Or the medical director?

A.      Could be.

Q.      And then once you printed it out, did you put it in the policy manual?

A.      I don't recall putting it in the policy manual.

Q.      Well, what did you do with the printed copies?

A.      They were already on the intranet, so maybe nothing.

*See* Exhibit 8, 89:8 to 92:1. The South County Hospital Urgent/Walk-In Care was part of the same intranet[5] as the hospital, utilized the hospital's policies, and operated under the hospital's policies. The functioning of the Urgent Care as a medical facility was intimately tied to the hospital.

In an attempt to differentiate the Urgent Care from South County Hospital and avoid the requirements of EMTALA, Defendant summarily states that "the Wellness Center operates under a

---

[5] Merriam-Webster defines "intranet" as "a network operating like the World Wide Web but having access restricted to a limited group of authorized users (as employees of a company)." http://www.merriam-webster.com/dictionary/intranet

different Medicare provider number from South County Hospital and has its own NPI [National Provider Identifier] number." *See* Defendant's Motion, pg. 11. Defendant has offered no proof of this assertion and does not point to any pleadings, materials, or discovery on file. A review of the billing of Mrs. Friedrich's visit to the South County Hospital Urgent/Walk-In Care shows that at least two NPI numbers were used in the course of billing, including NPI 1528152691 (associated with Silver Spring Healthcare) and 1952366106 (associated with South County Hospital). *See* Billing Documentation, attached hereto as <u>Exhibit 12</u>. While all of Mrs. Friedrich's care on September 9, 2013 was rendered at the Wellness Center location, her insurer was billed separately for laboratory and diagnostic testing (to the South County Hospital NPI number) and other services received that day (to Silver Spring Healthcare). The multiple NPI numbers appearing on Mrs. Friedrich's bill create—at a minimum—an inference that the Wellness Center and the Hospital are operating in conjunction with one another and as part of the same Medicare number.

Defendant's 30(b)(6) designee addressed billing practices at a deposition noticed to "the person with the most knowledge of the relationship between South County Hospital Healthcare System and South County Hospital Medical and Wellness Center." The designee testified in part as follows:

> Q.    Okay.  In the course of looking back at the finances and the relationship between the Healthcare System and the Urgent Care you described speaking with the comptroller for the Healthcare System, right?
>
> A.    Correct.
>
> Q.    So again, focusing on the five years, the last five years, so about 2010 or so, and I say or so because there may have been a change in, you know, 2009 or 2011 that's relevant to some of my questions, so if you could sort of use that as sort of a loose point in time so that we capture, you know, the evolution of the relationship.  I take it that the Healthcare System was managing all of the finances for the Urgent Care, is that right?
>
> A.    That's correct.
>
> Q.    So to put it differently, the Urgent Care did not manage any of its own finances, that all went through the Healthcare System, is that right?

> A. Yes.  They would be responsible for working within a budget at the Urgent Care Center, but the System would develop with Urgent Care what their budget was and does all the billing. All of that is centralized --
>
> Q. Okay.
> A. -- actually, into two buckets.
>
> Q. And what are those two buckets?
> A. Professional fees have -- are billed through an affiliate company called Silver Spring Health  with a separate federal tax ID number from facility fees.  It's easier for everybody to keep track,  third-party  payers,  the  federal government, us. So professional fees for one affiliate, and then the hospital's Finance Department handles all of the routine, non-professional.
>
> Q. Everything else?
> A. Everything else.

*See* Deposition of South County Hospital Healthcare System, re: SCHHS relationship, 22:21 to 24:14, attached hereto as <u>Exhibit 13</u>. The healthcare system controlled and managed the finances of South County Hospital and all of its components, including the Wellness Center. (Silver Spring Health's involvement with the healthcare system appears to be limited to billing and clerical functions.) Portions of treatment rendered at the Urgent Care were directly billed under the South County Hospital, which underscores that the Urgent Care is an off-campus facility that is considered part of the hospital for Medicare cost reimbursement purposes.

The evidence is overwhelming that the South County Hospital Urgent Care/Walk-In Center was part of South County Hospital, was managed by South County Hospital, and operated in conformity with the policies and procedures of South County Hospital. As the South County Hospital Urgent/Walk-In Care is an emergency department of a hospital that is subject to the requirements of EMTALA, it bears the burden of the responsibilities given to hospitals under EMTALA.

## II. THE SOUTH COUNTY HOSPITAL URGENT/WALK-IN CARE IS A DEDICATED EMERGENCY DEPARTMENT UNDER EMTALA

By promulgating regulations, CMS has clarified that EMTALA applies beyond the traditionally emergency room, including within its scope facilities not physically connected to a hospital and to facilities the core functions of which is not emergency care. The First Circuit has recognized that EMTALA extends to a Medicare participating hospital that operates an emergency department *or an equivalent facility. See, e.g., Alvarez-Torres* at 51, discussed *supra* (Emphasis supplied). EMTALA applies to the South County Hospital Urgent/Walk-In Care, despite being located off campus, because it meets the standard of a dedicated emergency department. The definition of "dedicated emergency department" encompasses "any department or facility of the hospital, regardless of whether it is located on or off the main hospital campus" that meets at least one of three requirements:

1) It is licensed by the State in which it is located under applicable State law as an emergency room or emergency department;
2) It is held out to the public (by name, posted signs, advertising, or other means) as a place that provides care for emergency medical conditions on an urgent basis without requiring a previously scheduled appointment; or
3) During the calendar year immediately preceding the calendar year in which a determination under this section is being made, based on a representative sample of patient visits that occurred during that calendar year, it provides at least one-third of all of its outpatient visits for the treatment of emergency medical conditions on an urgent basis without requiring a previously scheduled appointment." 42 C.F.R. § 489.24

Despite the defendant's assertions to the contrary, there is ample evidence and authority to support that the South County Hospital Urgent/Walk-In Care meets at least one of these requirements.

### A. THE SOUTH COUNTY HOSPITAL URGENT/WALK-IN CARE IS HELD OUT TO THE PUBLIC AS A PLACE THAT PROVIDES CARE FOR EMERGENCY MEDICAL CONDITIONS ON AN URGENT BASIS WITHOUT REQUIRING A PREVIOUSLY SCHEDULED APPOINTMENT

South County Hospital Urgent/Walk-In Care meets the criteria set forth in the second prong of the CMS regulations defining "dedicated emergency departments". Both South County Hospital

and South County Hospital Urgent/Walk-In Care hold out the Urgent Care to the public as a place that provides care for emergency medical conditions on an urgent basis without requiring a previously scheduled appointment.  The manner in which South County Hospital and South County Hospital Urgent/Walk-In Care hold themselves out to the public matches the representations that CMS has recognized invite the public to expect care for emergency conditions.

CMS does not impose a burden upon patients seeking immediate care to parse a difference 'emergent' and 'urgent'.[6] In its Final Rule, CMS states that:

> We believe it would be very difficult for any individual in need of emergency care to distinguish between a hospital department that provides care for an "urgent need" and one that provides care for an "emergency medical condition" need. **Indeed, to CMS, both terms seem to demonstrate a similar, if not exact, functionality.** Therefore, we are not adopting the commenters' suggestion to except urgent care centers from dedicated emergency department status. As we have discussed above, if the department or facility is held out to the public as a place that provides care for emergency medical conditions, it would meet the definition of dedicated emergency department. An urgent care center of this kind would fall under this criterion for dedicated emergency department status.

See Exhibit 1 at 53,231. (Emphasis supplied).  Furthermore, the Final Rule states that "[t]he definition [of dedicated emergency department] would also be interpreted to encompass those off-campus hospital departments that would be perceived by an individual as appropriate places to go for emergency care." See id. at 53,248.

The fact that their Urgent Care will be "perceived by an individual as appropriate places to go for emergency care" is recognized by the representative of the Hospital and by the physician and nurse employed by the Hospital who staff South County Hospital Urgent/Walk-In Care.  Therefore, the Urgent Care has prepared for patients presenting with emergency medical conditions. The

---

[6] Merriam-Webster defines "**urgent**" as "very important and needing immediate attention; showing that something is very important and needs immediate attention." http://www.merriam-webster.com/dictionary/urgent.  Merriam-Webster defines "**emergent**" as "arising unexpectedly; calling for prompt action." http://www.merriam-webster.com/dictionary/emergent.

defendant's 30(b)(6) designee acknowledged at her deposition that the South County Hospital

Urgent/Walk-In Care may receive patients with emergency needs and must be prepared for such.

Defendant has produced a memo kept at the registration desk of the Urgent Care, attached hereto as

Exhibit 14, notifying staff to alert the nurse if patients present with complaints of chest pain,

shortness of breath, slurred speech, light-headedness, numbness or tingling, any audible wheezing,

head injuries, or projectile eye injury. The 30(b)(6) designee testified that certain presenting

complaints, such as these, by Urgent Care patients may be time sensitive, outside the scope of

Urgent Care, and could involve emergency medical conditions:

> Q.    What is your understanding as to the purpose of the alert?  I mean,
> obviously, its purpose is, as you stated, to alert the nurse of any of these
> presentations, but why is it that these types of presentations need to involve
> the nurse immediately?
> A.    Because evaluation and treatment is time sensitive.
>
> Q.    I'm sorry.  Go ahead.
> A.    And could be outside the scope of an Urgent Care. So someone with an
> arrow sticking out of their eye.
>
> Q.    In other words, items on this list can involve emergency medical conditions.
> A.    Could, or just have a time sensitivity to their evaluation.  For example,
> slurred speech.  If you were concerned about a stroke, there's a time element
> associated with evaluating a patient with a potential stroke so you wouldn't
> want them to sit in the waiting room.
>
> Q.    Okay.  So if I understand correctly, these are medical conditions that have in
> common two components, one is the identification and treatment may need
> to be done soon, and secondly, that the implications of not diagnosing and
> treating soon could be serious.  They have those two components in
> common.
> A.    Or not appropriate.
>
> Q.    Not to say that those are the only components they have in common, but
> just -- would you agree that that list of presenting complaints has two
> components in common? One is that the identification and treatment of the
> condition may be time sensitive, that is it might get worse quickly.  They have
> that in common.
> A.    Or the intervention needed is time sensitive.
>
> Q.    Because the condition could get worse quickly.
> A.    Yes.

Q.    So that's one thing they have in common.
A.    Yes.

Q.    And another thing they have in common is that they present at least the possibility of a serious medical outcome.
A.    Yes.

Q.    And you would agree that conditions that, one, need to be dealt with quickly because they can get worse in a short period of time, and two, have the potential to implicate a serious medical outcome, those types of conditions we also call emergencies.
A.    Yes.

Q.    Do you know at what point in time the Healthcare System created this alert for the Urgent Care?
A.    I don't have a specific date and time, but I'm told it had been hanging there for years.

*See* Exhibit 13, 57:21 to 60:12. In another 30(b)(6) deposition, noticed to "the person with the most knowledge of South County Hospital Healthcare System policies, procedures, protocols, mandates and the like concerning in any way South County Hospital Healthcare System Compliance with EMTALA," the designee agreed that "the Urgent Care does need to be prepared to respond to people who present with a medical condition manifested by acute symptoms severe enough to place the health of the individual in serious jeopardy." *See* Deposition of South County Hospital Healthcare System, re: EMTALA, attached hereto as Exhibit 15, 27:3 to 30:13. The recognition of the need to be prepared to care for patients with emergency medical conditions was shared by the Medical Director, the Nurse Manager, and a practicing registered nurse of the South County Hospital Urgent/Walk-In Care.[7]

---

[7]    Q:    So you understand that the Urgent Care Center may and does see patients who are sufficient emergent to present to an emergency room. You under that that does happen, correct?
             MR. LATHAM:    Objection.
             MR. SARLI:        Objection.
       A:    I understand that.
       Q:    So the Urgent Care has to be prepared for – to receive patients who may be sick enough to be sent in the emergency room and admitted. The Urgent Care has to be prepared for that, correct?
             MR. LATHAM:    Objection.

Because the Urgent Care is perceived as an appropriate place to go for emergency care, the hospital has policies in place for these situations. An example is the Urgent Care's policy concerning patients presenting with chest pain. The Chest Pain Protocol/Urgent Care, found in the Urgent Care manual, "is to be implemented by the RN for the appropriate and expedient treatment of chest pain," and includes steps such as obtaining an EKG, calling 991 or EG Rescue, and notifying the attending physician. *See* Exhibit 9. Further, the Urgent Care has its own specific "Emergency Protocol" in the event of cardiac or respiratory arrest, attached hereto as Exhibit 18.[8]

---

> A.     We recognize that patients that present may be more appropriately care for at a different facility.
> Q:     And that wasn't exactly my question. My question was whether you would agree that the Urgent Care Center has to be prepared for patients who are sick enough or present with a sufficient emergent condition that they could be seen in an emergency room and admitted. The Urgent Care Center has to be prepared for those kinds of patients, correct?
>             MR. LATHAM:     Objection.
>             MR. SARLI:     Objection. You can answer.
> A:     Those patients do present to the Urgent Care, yes.
> ***
> Q:     Because a patient can't necessarily know whether the condition that he or she has is more appropriate for an urgent care or an emergency room. The patient him or herself may not know that, correct?
> A:     I believe so, yes.

*See* Deposition of Dr. Turner, 81:11 to 83:9, attached hereto as Exhibit 16.

> Q:     Well, did you ever – as practice manger and the person responsible for the nursing staff, did you ever prepare the nursing staff for a circumstance where a patient would require basic life support? Did you ever prepare the nursing staff for that?
> A:     Yes.

*See* Murphy Deposition, Exhibit 8, at 112:22 to 113:4.

> Q:     Tell me the procedure that was followed in September of 2013 when a patient presented who needed the level of care available at an emergency room. What procedure would be followed?
> A:     That would be up to the physician evaluating the patient.
> Q:     You mean up to the physician to make the decision as to whether a higher level of care was needed?
> A:     Correct.
> Q:     And when that decision was made, what procedure would be followed to implement it, do you know?
>             THE WITNESS: If the physician dediced that yes, they needed a higher level of care?
>             MS. WEIZENBAUM:     Uh-huh.
> A:     Then we would call the EMS and the patient would be transferred to the hospital.
> Q:     Did that ever happen – has that even happened while you've been at the Urgent Care?
> A:     Yes.

*See* Deposition of Ashley Willette, R.N., 88:23 to 89:23, attached hereto as Exhibit 17.

[8] Significantly, the South County Hospital Urgent/Walk-In Care Policy Manual existed prior to defendant Turner's tenure as Medical Director (see Turner depo. at 41-48, Exhibit 16), and is entitled "South County Hospital ED/Urgent Care Policies and Procedures," attached hereto as Exhibit 19.

Recognizing that its Urgent Care patients will present with emergency medical conditions and that the transfer of a patient with an emergency medical condition triggers EMTALA, the defendant Hospital created policies concerning transfer of such patients that conform exactly to their obligations under EMTALA. Providing an appropriate transfer is one of the requirements of EMTALA, and the Urgent Care has designed policies that conform to these requirements. Defendant has produced an "Authorization for Transfer" from the Urgent Care manual, attached hereto as Exhibit 20, which directly addresses assessment of emergency medical conditions and reasons for transfer. Ms. Murphy, the practice manager, testified that the use of this form was discontinued at some point and replaced by the use of the Meditech system, but acknowledged that certain determinations still needed to be made before transferring patients:

> Q.    Right.  Let's put aside Meditech because I'm not asking about that.  I'm
>        asking about transfer of patients.  So would you agree that when you were a
>        practice manager in 2012, 2013, you understood that before a patient could
>        be transferred to another facility a doctor had to determine, first of all, does
>        this patient have an emergency medical condition, right?
>              MR. LATHAM:  Objection.  You can answer if you know.
> A.    Oh, the doctor would have to determine that, yes.
>
> Q.    And then the doctor would have to determine is the patient stable for
>        transfer, right?
>              MR. LATHAM:  Objection.  You can answer.
> A.    Well, being Urgent Care, you know, we'd have to stabilize the patient.  That's
>        a doctor's determination as well.
>
> Q.    In order to transfer them?
> A.    Yes.

See Exhibit 8, 116:19 to 117:13. Defendant has also produced reports that track the number of patients with chest pain presenting to the Urgent Care, a complaint that Defendant has recognized as an indicator of a possible emergency medical condition. See Performance Improvement Reports, attached hereto as Exhibit 21. This reporting clearly contemplates that the Urgent Care will see patients with emergency medical conditions, such as cardiac issues, which will necessitate transfer.

The transfer policy as laid out on the authorization form and by Ms. Murphy's testimony precisely conforms to each EMTALA requirement pertaining to patient transfer.

The scenario envisioned by CMS in which a lay person cannot distinguish between a facility for an "urgent need" and one for an "emergency medical condition" is perfectly illustrated when considering the facts of the instant matter. Mrs. Friedrich presented to the Urgent Care with waxing and waning symptoms that had been present for several days. Mrs. Friedrich sent a text message to a coworker informing her that, "I had to get checked out at the ER for something." *See* Text Messages, attached hereto as Exhibit 22. She sent a text message to another coworker, stating that "I've been in such terrible distress since Saturday night… Headed up to work this morning… Saw south county walk in hospital [sic] from the highway and pulled in to get checked out! All the symptoms of a female type heart attacked but new [sic] it could't [sic] be… But since i'm [sic] not a doctor i [sic] thought it wax [sic] a good idea to get checked out." *See id.*

Mrs. Friedrich did not know whether she had an "emergency medical condition" or an "urgent" condition. The totality of the evidence supports that the South County Hospital Urgent/Walk-In Care is an "appropriate facility" for emergency care, as it holds itself out to the public as a provider for "conditions requiring prompt attention," it anticipates patients seeking treatment for emergencies, it plans for patients seeking treatment for emergencies, and treats patients seeking care for emergencies, either on site or by providing appropriate transfer.

The defendant Hospital has produced many materials through the course of discovery that evidence the fact that the Urgent Care was held out as place that provides care for emergency medical conditions on an urgent basis and actually operated in conformity with this perception. A flier for the Urgent & Walk-In Care, produced by Defendant's 30(b)(6) designee, attached hereto as Exhibit 22, advertises that the Urgent Care "treats virtually *any urgent care need*, such as lacerations, upper respiratory illnesses, sprains, sports injuries, minor accidents, sore throat, [and] *other conditions*

*requiring prompt attention.*" (Emphasis supplied). The Urgent Care emphasizes that appointments are not necessary. *Id.* By stating that "conditions requiring prompt attention" will be treated, the Urgent Care has opened its doors to patients with all types of urgent medical needs.

Applying the CMS regulations, the South County Hospital Urgent/Walk-In Care must be subject to the EMTALA requirements. When confronted with interpreting EMTALA provisions, the First Circuit "look[s] for guidance to any relevant regulations promulgated by an agency charged with administering the statute." *Morales v. Sociedad Espanola de Auxilio Mutuo y Beneficencia*, 524 F.3d 54, 57 (1ˢᵗ Cir. 2008) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Muñiz v. Sabol,* 517 F.3d 29, 38 (1ˢᵗ Cir. 2008)). In *Morales,* the Court sought to interpret the EMTALA provision that one "come to the emergency department" of a hospital as pertains to patients in ambulances. The Court instructs that "a court should interpret a regulation so that, "if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Morales* at 59. (Internal citations omitted). The Court first turned to the text of the EMTALA statute and to the regulations, and then to the agency's own interpretation and guidance. Here, the agency has clearly stated that "urgent care" centers are not exempt from dedicated emergency department status, and that the definition of dedicated emergency department is interpreted to include off-campus hospital departments that are perceived as "appropriate places" to go for emergency care. *See* Exhibit 1 at 53,231. Undoubtedly, an urgent care center that is a department of a hospital, has full access to the hospital's resources, has policies in place for the treatment of patients with emergent conditions, and has an EMTALA-compliant transfer protocol is an "appropriate place" to go for emergency care.

Defendant points to promotional materials it created asserting that the Urgent Care it is not an emergency room or department, and promotes the capability to treat "non-emergency needs." *See* Defendant's Motion, pg. 12. Defendant has offered no proof of this assertion, save for two

footnotes citing sections of the *current* South County Health website.  Defendant's attempt to shift the burden to the patient to understand the difference between "urgent" and "emergent", assess the level of their medical needs prior to choosing a facility and understand what their particular set of symptoms necessitates is an approach expressly rejected by CMS.  Ultimately, citations to its current website, over two years after the incident in question, should be given little if any weight and certainly fails to counter the overwhelming evidence that the South County Hospital Urgent/Walk-In Care "is held out to the public (by name, posted signs, advertising, or other means) as a place that provides care for emergency medical conditions on an urgent basis without requiring a previously scheduled appointment" in accordance with 42 C.F.R. § 489.24.

Defendant exclusively relies on the First Circuit's decision in *Rodriguez v. American Int'l. Ins. Co. of Puerto Rico*, 402 F.3d 45 (1ˢᵗ Cir. 2005) for the contention that an urgent care facility is not a hospital emergency department. In *Rodriguez*, the Court addressed the issue of whether outpatient diagnostic and treatment centers known as "centro de diagnostico y tratamiento" ("CDT") in Puerto Rico are subject to the requirements of EMTALA. The Court held that the requirements of EMTALA did not apply to CDTs, because "[t]here is no legal ambiguity about the language Congress used in EMTALA—EMTALA requires the emergency room be of a participating *hospital*." *Id.* at 49 (emphasis in original).

The *Rodriguez* holding is inapplicable to the case at hand. The CDT considered by the First Circuit was not a hospital-based facility, nor attached to or associated with a hospital. Here, the Urgent Care is a department of South County Hospital, and operates and functions in conjunction with the hospital, as discussed *supra*. This key difference between a free-standing center offering emergency services and an emergency department associated with a hospital was even considered by the Court, which noted "[t]he 'dedicated emergency department' may be physically located off campus from the main hospital building, but it still must be a part of a hospital." *Id.* at 48. This was

simply not the case in *Rodriguez*. As such, Rodriguez is not the proper lens through which to evaluate the applicability of EMTALA to the South County Hospital Urgent/Walk-In Care.

**B.    THAT THE SOUTH COUNTY HOSPITAL URGENT/WALK-IN CARE IS NOT LICENSED BY THE STATE OF RHODE ISLAND AS AN EMERGENCY ROOM OR EMERGENCY DEPARTMENT IS INCONCLUSIVE AS TO ITS STATUS AS A DEDICATED EMERGENCY DEPARTMENT**

Defendant has also attempted to refute the claims that the South County Hospital Urgent/Walk-In Care is exempt from EMTALA by referencing the first prong of 42 C.F.R. § 489.24, which recognizes that where the off campus department or facility is licensed under State law as an emergency room or emergency department it is subject to EMTALA. Clearly, the fact that the Urgent Care is not licensed by the State of Rhode Island as an emergency room or emergency department is a red herring. The Urgent Care shares a piece of the South County Hospital's license as a hospital premises or component. The Urgent Care did not require nor could it have been licensed as an emergency room or emergency department, as Rhode Island has licensed each premises and related operation of South County Hospital as part of the main hospital's license, as discussed *supra*. The particular license held by the Wellness Center and Urgent Care simply reinforces that the Urgent Care is operating part and parcel as a department of South County Hospital, thus establishing that the Urgent Care is subject to EMTALA as a department of a federally funded hospital providing emergency care.

**C.    THERE IS INSUFFICIENT EVIDENCE TO ASSESS WHETHER THE SOUTH COUNTY HOSPITAL URGENT/WALK-IN CARE MEETS THE "ONE-THIRD" REQUIREMENT**

Defendant's analysis of the third prong also fails. In support of its contention that the Urgent Care did not provide at least one-third of all of its outpatient visits for the treatment of emergency medical conditions on an urgent basis without requiring a previously scheduled appointment, Defendant provides deposition testimony and an "EGUC Monthly Census with Metrics" that purport to show that "only about 3% of the total numbers of patients who presented to the

Urgent/Walk-In Care" were transferred for a higher level of care. This is simply not how the "one-third" requirement is calculated.

First, Defendant is merely relying on statistics that show the number of patients who have been transferred for a higher level of care. This percentage entirely misses patients like Mrs. Friedrich who presented with an emergency medical condition that was not identified because of an insufficient medical examination, patients like Mrs. Friedrich who were improperly discharged without stabilization rather than given an appropriate transfer and patients that presented with an emergency medical condition and were treated for that condition. Second, the State Operations Manual created by CMS and cited by the Defendant, provides the proper analysis by which to determine the one-third requirement:

> To determine if a hospital department is a dedicated emergency department because it meets the "one-third requirement" described above (i.e., the hospital, in the preceding year, had at least one-third of all of its visits for the treatment of EMCs on an urgent basis without requiring a previously scheduled appointment) the surveyor is to select a representative sample of patient visits that occurred the previous calendar year in the area of the hospital to be evaluated for status as a dedicated emergency department. This includes individuals who may present as unscheduled ambulatory patients to units (such as labor and delivery or psychiatric units of hospitals) where patients are routinely admitted for evaluation and treatment. The surveyors will review the facility log, appointment roster and other appropriate information to identify patients seen in the area or facility in question. Surveyors are to review 20 - 50 records of patients with diagnoses or presenting complaints, which may be associated with an emergency medical condition (e.g., cardiac, respiratory, pediatric patients (high fever, lethargic), loss of consciousness, etc.). Surveyors have the discretion (in consultation with the regional office) to expand the sample size as necessary in order to adequately investigate possible violations or patterns of violations. Do not allow the facility staff to select the sample. Review the selected cases to determine if patients had an emergency medical condition and received stabilizing treatment. If at least one-third of the sample cases reviewed were for the treatment of EMCs on an urgent basis without requiring a previously scheduled appointment, the area being evaluated is a dedicated emergency department, and therefore, the hospital has an EMTALA obligation. Hospitals that may meet this one-third criterion may be specialty hospitals (such as psychiatric hospitals), hospitals without "traditional" emergency departments, and urgent care centers. In addition, it is not relevant if the entity that meets the definition of a dedicated ED is not located on the campus of the main hospital.

*See* State Operations Manual (Rev. 60, 07-16-10).[9]

       Defendant's 30(b)(6) representative addressed the way the Urgent Care tracked statistics of

patients presenting for treatment of emergency medical conditions:

> Q.     Okay. Do you know using the EMTALA definition of emergency medical
> condition -- and we went over that before, that is, the patient presenting with
> symptoms sufficiently severe to – I'm sorry -- the patient presenting with a
> medical condition with symptoms sufficiently severe to indicate the patient's
> health is at risk of serious jeopardy, do you know how many patients who fit
> that definition present to South County Hospital Urgent Care on an annual
> basis? Do you know?
> A.     Present or get transferred?
>
> Q.     Present.
> A.     No.
>
> Q.     Is it fair to say that if those records were kept, you'd be aware of it?
> A.     If the records --
>
> Q.     If records were kept that indicated what proportion of patients presenting
> annually presented with an emergency medical condition, if records like that
> were kept, you'd be aware of it?
> A.     Probably. I know they keep records that talk about the number of patients
> transferred, where they were transferred to, so I'm not sure why they would
> just keep -- say it again. A record of who presented there?
>
> Q.     With emergency medical conditions.
> A.     That resulted in transfer? If you had an emergency medical condition that
> was deemed significant and by the doctor's assessment, doing his qualifying
> medical evaluation, they would transfer the patient.
>
> Q.     Okay. Do you know what proportion of patients present to the Urgent Care
> and are transferred to a higher level of care? Do you know?
> A.     I can get that information. Off the top of my head, I don't, but I know it's -
> I remember seeing it as a metric.

*See* Exhibit 15, 62:21 to 64:10. Defendant's record keeping on this issue is limited to those patients

who were provided with transfer. Therefore, Defendant's self-reported analysis that the Urgent Care

did not fulfill the one-third requirement is not an adequate representative sample size, and is nothing

---

[9] https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/som107c01.pdf

more than self-serving and speculative. Without a proper representative sample size, there is a genuine issue of material fact as to whether the South County Hospital Urgent/Walk-In Care meets the third requirement in the determination of dedicated emergency departments.

## CONCLUSION

Urgent care centers have become a settled reality in our nation's system of health care delivery.  Some of these centers are freestanding, with no relationship to a hospital that has the capacity to prepare for emergency medical conditions.   Others, like South County Hospital Urgent/Walk-In Care, are entwined with – and held out as part of – a fully-functioning hospital.  To exempt South County Hospital's urgent care from an important law that advances safe care does a dangerous disservice to the public.   For this, and the foregoing reasons, including Plaintiff's Statement of Disputed Facts and Statement of Undisputed Facts, Plaintiffs respectfully request that this Honorable Court deny Defendant's partial motion for summary judgment as to Counts I and II of Plaintiffs' Complaint.

Plaintiffs,
By their Attorneys,


/s/ Miriam Weizenbaum
Amato A. DeLuca (#0531)
Miriam Weizenbaum (#5182)
**DeLUCA & WEIZENBAUM, LTD.**
199 North Main Street
Providence, RI  02903
(401) 453-1500
(401) 453-1501 Fax

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STEPHEN FRIEDRICH, Individually     :
and as Executor of the Estate of      :
PATRICIA FRIEDRICH and p.p.a. S.F.;  :
and AMY FRIEDRICH              :
                                   :
v.                           :        C.A. No. 1:14-cv-00353-L-PAS
                                   :
SOUTH COUNTY HOSPITAL        :
HEALTHCARE SYSTEM;           :
JOSEPH P. TURNER, D.O.;       :
JOHN and/or JANE DOE, Alias; and  :
JOHN DOE CORPORATION, Alias   :

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF) and that paper copies have been sent to those indicated as non-registered participants (if applicable) on this 24TH day of December 2015.


/s/ Miriam Weizenbaum